**[J-51-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 30 EAP 2019 |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Superior Court entered on March 5, |
| | : | 2019 at No. 3246 EDA 2017 |
| v. | : | affirming the Judgment of Sentence |
| | : | entered on September 12, 2017 in |
| | : | the Court of Common Pleas, |
| KEITH ALEXANDER, | : | Philadelphia County, Criminal |
| | : | Division at No. CP-51-CR-0005971- |
| Appellant | : | 2016 |
| | : | |
| | : | SUBMITTED: April 28, 2020 |


**OPINION**


**JUSTICE DONOHUE**                    **DECIDED: December 22, 2020**

We granted Appellant Keith Alexander ("Alexander")'s petition for allowance of

appeal asking this Court to overrule or limit *Commonwealth v. Gary*, 91 A.3d 102 (Pa.

2014) (OAJC), a plurality result announcing that, without limitation, the federal automobile

exception to the warrant requirement of the Fourth Amendment[1] to the United States

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Constitution applies in Pennsylvania.[2]  The United States Supreme Court's Fourth Amendment jurisprudence "recognizes the exception in a categorical manner and the lawfulness of the search 'do[es] not require an assessment of whether the policy justifications underlying the exception, which may include exigency-based considerations, are implicated in a particular case.'"  *Missouri v. McNeely,* 569 U.S. 141, 150 n.3 (citing *California v. Acevedo,* 500 U.S. 565, 569–70 (1991)).  What *Gary* did not settle is whether the federal automobile exception is consistent with Article I, Section 8 of the Pennsylvania Constitution.[3]  We have accepted the current appeal to answer that question.  For the reasons discussed in this opinion, we hold that Article I, Section 8 affords greater protection to our citizens than the Fourth Amendment, and reaffirm our prior decisions: the Pennsylvania Constitution requires both a showing of probable cause and exigent circumstances to justify a warrantless search of an automobile.

## I.  Factual and Procedural History

At approximately 2:30 a.m. on May 11, 2016, Philadelphia Police Officer Joshua Godfrey and his partner stopped a vehicle driven by Alexander.  The officers smelled marijuana, and Alexander stated that he and his female passenger, who owned the vehicle, had just smoked a blunt.  Officer Godfrey arrested Alexander and placed him in

---

[2] Three Justices opined that Article I, Section 8 of our charter offers no greater protections than the Fourth Amendment.  Then-Justice, now Chief Justice, Saylor "join[ed] the lead Justices in adopting the federal automobile exception," 91 A.3d at 138 (Saylor, J., concurring), but did not join the lead opinion.  The concurring opinion provided the critical fourth vote that bound the lower courts despite the lack of a majority rationale.

[3] "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."  Pa. Const. art. I, § 8.

the patrol vehicle, while the passenger was removed from the car. The officers searched the interior for more marijuana but found only a metal box behind the driver's seat. The box opened with a key Alexander had on his keychain and contained bundles of heroin. Alexander was charged with, inter alia, possession with intent to deliver and filed a suppression motion challenging the search, which was denied. At a bench trial, he was convicted of possession with intent to deliver.

The Superior Court affirmed, denying Alexander's claim that the officers (1) lacked probable cause to search the vehicle and (2) needed a warrant to search the lockbox. The Superior Court noted that, under *Gary,* all that was needed to search a vehicle is probable cause and the scope of the search extends to any container that may contain the relevant items. As the lockbox could have contained marijuana, the search was lawful. Alexander argued that *Gary* should be overruled, which the Superior Court observed was done to preserve the issue for this Court's review. We thereafter accepted review on the following question:

> In this case involving the warrantless search of a locked metal box in a car following the arrest of the driver, should not this court decide whether *Commonwealth v. Gary*, 625 Pa. 183, 91 A.3d 102 (2014), should be overruled or limited as being inconsistent with privacy protections under Article I, § 8, and this Court's decisions protecting privacy through the warrant requirement?

*Commonwealth v. Alexander*, 218 A.3d 380 (Pa. 2019).

## II. *Gary* and the Automobile Exception

The parties differ on whether the outcome of the suppression motion would have been different prior to *Gary*. What is clear is that the federal exception as adopted by *Gary* authorized the instant search. *See United States v. Ross*, 456 U.S. 798, 825 (1982)

(holding that probable cause to search extends to every part of the vehicle and its contents that may conceal the object of the search); *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) (holding that *Ross* extends to objects owned by a passenger; "Passengers, no less than drivers, possess a reduced expectation of privacy with regard to the property that they transport in cars . . . ."). We now turn to how the federal automobile exception came to govern claims challenging warrantless automobile searches in Pennsylvania.

1.

In *Gary*, Justice McCaffrey, joined by then-Chief Justice Castille and Justice Eakin, traced the development of the automobile exception in federal court and its corresponding development in our courts. The automobile exception was first recognized in *Carroll v. United States*, 267 U.S. 132 (1925), and the justification for upholding the search was largely based on the impracticability of securing a warrant given that "the vehicle can be quickly moved out of the locality or jurisdiction . . . ." *Id.* at 153. While *Carroll* noted that "[i]n cases where the securing of a warrant is reasonably practicable" an officer must do so, *id.* at 156, over time that limitation gradually disappeared. In *Chambers v. Maroney*, 399 U.S. 42 (1970), the Court upheld a search under the automobile exception where the officers transported the vehicle to the police station and searched it there without a warrant. The Court concluded that if the officers could immediately search the car under *Carroll*, then they may also search it later. That holding is at odds with *Carroll*'s observation that officers must obtain a warrant when feasible. The *Maroney* Court reconciled that inconsistency by declaring that the preference for a magistrate's judgment on probable cause is questionable because officers could seize the car until the magistrate ruled on whether probable cause to search existed. The *Maroney* Court

believed it was arguable that seizing the car and its occupants was a greater intrusion than simply immediately searching the car. "But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances." *Id.* at 51-52. The Court found it preferable to declare that either course is reasonable under the Fourth Amendment.

The high Court also began to justify the automobile exception on the notion that individuals have reduced expectations of privacy in their automobiles and expect less privacy in their vehicles due to "the pervasive governmental regulation of, and local law enforcement's extensive contact with, motor vehicles." *Gary*, 91 A.3d at 110. The high Court used the mobility and diminished privacy rationales together to justify a warrantless search in *California v. Carney*, 471 U.S. 386 (1985). "The *Carney* Court invoked both the ready mobility and the reduced privacy justifications to hold that a warrantless search, based on probable cause, of a fully mobile motor home parked in a public lot did not violate the Fourth Amendment[.]" *Gary*, 91 A.3d at 111. Once those justifications were jointly invoked to justify searches it became clear that "application of the automobile exception to the requirement for a search warrant requires only a finding of probable cause and not a separate, distinct, or additional finding of exigency." *Id.* There is no question that the combination of the two rationales justifies the federal exception. *Collins v. Virginia*, ___ U.S. ___, 138 S. Ct. 1663, 1669–70 (2018) ("The 'ready mobility' of vehicles served as the core justification for the automobile exception for many years. Later cases then introduced an additional rationale based on the pervasive regulation of vehicles capable of traveling on the public highways.") (quotation marks and citations omitted).

Turning to Pennsylvania law, Justice McCaffrey's opinion concluded that "the unmistakable implication from our cases until the mid–1990s is that this Court considered the federal and state Constitutions coterminous" regarding the contours of the automobile exception. *Gary*, 91 A.3d at 112. Reviewing the Pennsylvania decisions in this area at length, his opinion observed that some cases before that time did suggest that our own constitution provided some heightened protections. The writing opined that those cases were mistakenly following the high Court's original *Carroll* rule and failed to keep up with doctrinal evolvements that embraced considerations beyond the inherent mobility of a vehicle. "However, while the federal automobile exception evolved to require only probable cause to search an automobile, our decisional law did not so evolve, but rather maintained its adherence to the original formulation of the exception." *Id.* at 120.

The *Gary* Court did not dispute that our cases eventually broke from the federal model, and both the lead opinion and the dissent identified the mid-1990s as the relevant timeframe. The reason for that shift was due, in part, to our seminal decision in *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), which rejected *United States v. Leon*, 468 U.S. 897 (1984) (holding that exclusionary rule does not apply if officers acted in objectively reasonable reliance on a subsequently invalided search warrant) as inconsistent with Article I, Section 8. "Article I, Section 8 is unshakably linked to a right of privacy in this Commonwealth," 586 A.2d at 898, and "[t]he history of Article I, Section 8 . . . indicates that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the 4th Amendment, as articulated by the majority in *Leon*." *Id.* at 897. While *Edmunds* involved

an application of the exclusionary rule, our holding was tethered to the fundamental concern for privacy within our own constitution, and our decision

> reiterated our statement in *Commonwealth v. Sell*, 504 Pa. 46, 65, 470 A.2d 457, 467 (1983), that "the survival of the language now employed in Article I, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth.

*Commonwealth v. Lewis*, 636 A.2d 619, 625 (Pa. 1994).

The first post-*Edmunds* case in this Court to present a claim under Article I, Section 8 seeking suppression of items recovered following a warrantless automobile search was *Commonwealth v. White*, 669 A.2d 896 (Pa. 1995), which held that the search at issue was invalid because the Commonwealth failed to establish any exigent circumstances beyond the vehicle's inherent mobility. *White* was decided within days of two other automobile search cases: *Commonwealth v. Labron*, 669 A.2d 917 (Pa. 1995), and *Commonwealth v. Kilgore*, 677 A.2d 311 (Pa. 1995). In *Labron*, the defendant explicitly raised a claim under Article I, Section 8, while the *Kilgore* defendant did not. Citing *White*, we held in *Labron* that a warrant was required. In *Kilgore*, we cited *Labron* but not *White* and likewise held that a warrant was required.

The Commonwealth appealed *Labron* and *Kilgore* to the United States Supreme Court. In a per curiam opinion reversing both cases and remanding for further proceedings, the high Court criticized those two decisions for "rest[ing] on an incorrect reading of the automobile exception to the Fourth Amendment's warrant requirement[.]". *Pennsylvania v. Labron*, 518 U.S. 938, 939 (1996) (per curiam). The Court held that it had jurisdiction because our decisions, while discussing "this Commonwealth's

jurisprudence of the automobile exception," 669 A.2d at 924, and discussing several of our own cases, did not satisfactorily demonstrate that the holdings constituted an adequate and independent state judgment not reviewable by the United States Supreme Court. The per curiam opinion stated that Pennsylvania law "thus appears to us 'interwoven with the federal law, and . . . the adequacy and independence of any possible state law ground is not clear from the face of the opinion.' " *Pennsylvania v. Labron*, 518 U.S. at 941 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-1041 (1983)) (ellipsis in original).

Justice Stevens, joined by Justice Ginsburg, dissented because "the best reading of *Labron*'s plain language is that it relied on adequate and independent state grounds." *Id.* at 943 (Stevens, J., dissenting). The dissent viewed our cases as grounded in our own law, which "is almost perfectly reflected in the dissents to each case that were penned by Justice Castille. In both instances, Justice Castille recognizes, even more explicitly than the majority, that the decisions were based on state law." *Id.* at 945. Later, the dissenting opinion stated: "*Labron* does not rest 'primarily' on federal law; as Justice Castille understood it, as the briefing in *White* understood it, and as the Commonwealth's decision to stay out of *White* demonstrates, every indication is that the rule adopted in *Labron* and *White* rests primarily on state law." *Id.* at 947.

On remand, this Court reinstated its prior order that was reversed by the United States Supreme Court. In an Opinion Announcing the Judgment of the Court authored by Justice Zappala, we quoted the vacated *Labron* decision and therefore rejected the

high Court's view that *Labron* was not based on an independent state ground.[4]  Justice Castille, joined by Justice Newman, dissented based on his original dissenting opinion. Justice Nigro concurred in the result without explanation.  Thus, three Justices adhered to *White*'s analysis and refuted the high Court's assessment.  *See Florida v. Powell*, 559 U.S. 50, 68 n.4 ("The [*Labron*] Court's analysis proved wrong; on remand, the Pennsylvania Supreme Court reaffirmed its prior holding . . . .") (Stevens, J., dissenting).

While the *Labron* remand was not decided by a majority of this Court, a number of our decisions garnering clear majorities cited *Labron* and *White* for the proposition that Article I, Section 8 offered greater protections than the Fourth Amendment.  In *Commonwealth v. Luv*, 735 A.2d 87, 94–95 (Pa. 1999), this Court addressed facts broadly similar to those in *White*.  Officers obtained a search warrant for Luv's residence based upon, inter alia, a controlled drug buy from Luv.  On the day that the warrant was to be served, an informant told police that Luv would be arriving at the residence with drugs in his vehicle.  The informant later stated that Luv was at Luv's girlfriend's house and would be taking the drugs to a nightclub.  Officers went to that residence and saw Luv's car. While police attempted to obtain a warrant for the vehicle, Luv entered the car and left the scene.  Because the warrant application would take at least an hour, and due to the information that Luv would sell the drugs in the nightclub, officers stopped and searched the car.

---

[4]  The Atlantic Reporter does not list the participating Justices.  However, the *Kilgore* decision on remand, which was issued the same day as the *Labron* remand, lists Justices Zappala, Cappy, Castille, Nigro, Newman, and Chief Justice Flaherty as the participating Justices.  Because the same Justices would have participated in both cases, Justice Zappala's opinion was apparently joined by Justice Cappy and Chief Justice Flaherty.

We favorably cited *White* for "the general rule that a warrant is required to search a vehicle," and found that the warrantless search was proper under the circumstances. Justice Castille concurred, noting his "belief that the majority continues to construe too narrowly the automobile exception to the warrant requirements," and urged the adoption of a bright-line rule as he had set forth in his *White* dissent. *Id.* at 95.

Other cases, which did not produce clear majorities, cited *White* for our departure from federal law. In *Commonwealth v. Perry*, 798 A.2d 697, 700 (Pa. 2002) (OAJC), Justice Cappy's opinion cited *White* for its holding that under Pennsylvania law "for a warrantless search of a motor vehicle to be valid, there must be a showing of both probable cause *and* exigent circumstances." Justice Castille, joined by Justice Nemwan, criticized the lead opinion for relying on what he viewed as dicta in *White*. Accepting arguendo that "if this Court ever actually examined the issue as a state constitutional matter" a majority would hold that exigency was required, Justice Castille argued that the qualifying exigency was simply that "probable cause arose unexpectedly, i.e. in circumstances that prevented police from securing a warrant before probable cause to search the vehicle arose." *Id.* at 717 (Castille, J., concurring). Then-Justice Saylor authored a concurring opinion, agreeing with Justice Castille that "the scope of protection afforded by Article I, Section 8 of the Pennsylvania Constitution in the arena of automobile searches is a matter less settled than the majority opinion portrays." *Id.* at 719 (Saylor, J., concurring). However, the opinion acknowledged that our cases have "nevertheless required both probable cause and exigent circumstances to justify a warrantless search, and, at least in broad overview, it would not appear to have been the Court's intent to dilute the exigent circumstances requirement by defining it solely in terms related to the

development of probable cause." *Id.* (citation to *Luv* omitted). Justice Nigro's dissenting opinion, joined by Justice Zappala, agreed that Article I, Section 8 requires both probable cause and exigent circumstances; their disagreement was in the finding that an exigency existed. "[C]oncluding that exigent circumstances excused the warrantless search of Appellants' car in the instant case . . . create[s] what amounts to an overarching warrant exception based on potential danger to the police." *Id.* at 721 (Nigro, J., dissenting). Thus, while the opinions widely varied, at least four Justices viewed it as settled law that Article I, Section 8 required some exigency in addition to probable cause.

In *Commonwealth v. McCree*, 924 A.2d 621 (Pa. 2007) (OAJC), a case involving an automobile search and application of the plain view exception, this Court described, for the first time, Pennsylvania law as recognizing a "limited" automobile exception. Justice Castille authored a concurring opinion in *McCree* reiterating his view that any Pennsylvania limitation on the automobile exception was confined to cases in which probable cause arose unexpectedly.

> It is enough to state, for present purposes, that: (1) if this Court were to squarely face the question of what is demanded by Article I, Section 8 respecting automobile searches, I remain inclined to hold that our approach should be coextensive with the federal approach under the Fourth Amendment; and (2) failing that square joinder of the issue, it is my view that this Court's existing Article I, Section 8 *holdings* in this area (which do not include a state constitutional analysis under [*Edmunds*], at most suggest that, if Article I, Section 8 requires an exigency to justify a probable cause-based warrantless entry of a vehicle (probable cause is the only federal requirement), all that is required is that the probable cause "arose unexpectedly, *i.e.,* in circumstances that prevented police from securing a warrant before probable cause to search the vehicle arose." *Perry,* 798 A.2d at 717 (Castille, J., concurring).

*Id.* at 635 (Castille, J., concurring) (footnote omitted).

In *Commonwealth v. Hernandez*, 935 A.2d 1275, 1280 (Pa. 2007), this Court addressed whether a warrantless search was authorized under this limited automobile exception. There, a shipping company employee became suspicious after Hernandez arrived to pick up twenty boxes. Lacking the money owed, Hernandez left. The employee opened up the packages and saw marijuana. He informed the police, who instructed the employee to let Hernandez pick up the packages. Hernandez returned, paid for the packages, and loaded them into a U-Haul truck, which the police stopped shortly thereafter. An officer who arrived on scene after the initial stop decided to open the rear rollup door for safety reasons, i.e. the potential presence of other people. He saw an open box with an object he believed to be consistent with narcotics. Officers obtained a search warrant for the truck based, in part, on what the officer observed.

Hernandez challenged the warrantless entry into the vehicle's cargo area. The majority began by discussing the federal rule: "Under the federal Constitution, law enforcement personnel may conduct a warrantless search of an automobile as long as probable cause exists." *Id.* at 1280. In comparison, "we have not adopted the full federal automobile exception." *Id.* (quoting *McCree*, 924 A.2d at 629). *Hernandez* stated that the "dual requirement of probable cause plus exigency is an established part of our state constitutional jurisprudence." *Id.* *Hernandez* settled that "danger to police or the public indeed satisfies the exigency requirement for warrantless vehicle searches in this Commonwealth." *Id.* at 1281. We took that step because the Superior Court had interpreted our precedents to mean that the "police danger exception" to the warrant requirement was a "separate and new 'exception' to the warrant requirement for vehicles." *Id.* at 1282. *Hernandez* clarified that danger to the police or public is simply an example

of a qualifying exigency that, when paired with probable cause, constitutes a valid exception to the warrant requirement. We cautioned, however, that just because "potential for danger to police or the public is enough to constitute exigent circumstances does not mean that a mere assertion of danger is sufficient. Rather, police must be able to articulate the danger posed under the specific circumstances of the case." *Id. Hernandez* applied that standard to the facts of the case and concluded that the asserted danger was insufficient to qualify as an exigent circumstance.[5]

Justice Castille concurred in the result only, filing an opinion expressing his view that "the warrantless search of the vehicle was justified under the automobile exception to the warrant requirement." *Id.* at 1285 (Castille, J., concurring). Justice Castille reiterated his view that this Court had rendered holdings establishing that probable cause and exigent circumstances must be present, but faulted those holdings for lacking a sufficient rationale. "[A]lthough there have been state constitutional **holdings** rendered under Article I, Section 8 which advert to some exigency beyond the federal requirement, there has yet to be a candid and responsible *Edmunds*-style state constitutional analysis or explanation for that departure from perfectly reasonable federal authority." *Id.* at 1286–87. Justice Castille believed that a qualifying exigency was present, i.e. the mobility of the vehicle plus the lack of sufficient time to obtain a warrant. *Id.* at 1288-89. In his view, the police could not be sure whether Hernandez would even return to the shipping store, and Hernandez ended up taking possession of the contraband within thirty minutes of the shipping employee's information. "In these exigent circumstances, it was not reasonably

---

[5] We ultimately determined that the search warrant was valid notwithstanding the references to the information gained by the illegal warrantless entry.

practicable for police to obtain a warrant in advance of the vehicle stop. That is enough to decide this case." *Id.* at 1290. Then-Justice Saylor, joined by Justice Eakin, authored a concurrence urging adoption of "the federal automobile exception subject to a warrant-when-practicable requirement[.]" *Id.* at 1290 (Saylor, J., concurring).

Following *McCree* and *Hernandez*, the Superior Court also began referring to the "limited" nature of Pennsylvania's automobile exception. In *Commonwealth v. Collins*, 950 A.2d 1041, 1045 (Pa. Super. 2008) (en banc), reflecting Castille's minority view in *McCree*, the panel observed in a footnote that the "more stringent 'limited automobile exception' . . . grants a lawful right of access without a warrant only in the additional circumstance that an officer had no advance knowledge notice that the vehicle stopped or encountered was involved in a crime." *Id.* at 1045 n.4.[6] In *Commonwealth v. Copeland*, 955 A.2d 396, 397 (Pa. Super. 2008), the court quoted *McCree* for the proposition that Pennsylvania recognizes a limited automobile exception. *Id.* at 400. However, that court viewed *McCree*, without the Castille overlay, as coterminous with *White*, writing that a warrantless search is authorized "when there exists probable cause to search and exigent circumstances necessitating a search." *Id.* (quoting *Commonwealth v. Casanova,* 748 A.2d 207, 211 (Pa. Super. 2000)). In *Commonwealth v. Brown*, 23 A.3d 544, 553 (Pa. Super. 2011) (en banc),[7] the court explained, "Our Supreme Court has never recognized the federal automobile exception . . . . Instead, in at least five cases, majorities of our

---

[6] This author dissented in *Collins*. Regarding the "limited automobile exception," the dissenting opinion characterized the majority's discussion as unnecessary and represented a "disputable interpretation of the status of the law in Pennsylvania[.]" *Collins*, 950 A.2d at 1048 n.8 (Donohue, J., dissenting).

[7] This author also wrote the opinion in *Brown*.

Supreme Court have rejected the federal automobile exception in favor of what the plurality in *McCree* dubbed the 'limited automobile exception.' "

2.

Taken together, prior to *Gary*, this Court's precedents clearly held that Article I, Section 8 did offer greater protections than the Fourth Amendment. Pennsylvania recognized an automobile exception, but unlike its federal counterpart, ours was "limited" in application. Indeed, even Justice Castille, the perennial critic of *White*, conceded that this Court held that Article I, Section 8 did not follow the United States Supreme Court in lockstep. *See Hernandez*, 935 A.2d at 1286-87 ("[A]lthough there have been state constitutional **holdings** rendered under Article I, Section 8 which advert to some exigency beyond the federal requirement, there has yet to be a candid and responsible *Edmunds*-style state constitutional analysis or explanation for that departure from perfectly reasonable federal authority.") (Castille, J., concurring). Chief Justice Saylor, concurring in *Perry*, agreed that this Court "has nevertheless **required** both probable cause and exigent circumstances to justify a warrantless search[.]" *Perry*, 798 A.2d at 719 (Saylor, J., concurring) (emphasis added).

While not explicitly questioning the stare decisis value of those cases Justice McCaffrey's opinion, echoing Justice Castille, criticized our precedents for failing to "conduct[ ] any analysis remotely similar to an *Edmunds*-style analysis or specifically address[ing] the requirements of the Pennsylvania Constitution in any way . . . ". *Gary*, 91 A.3d at 126 n.14. "The lack of a thorough, state-specific constitutional analysis has contributed to the confusion and disagreement with regard to the automobile exception that have continued . . . and indeed persist to this date, as is well-illustrated by

[J-51-2020] - 15

examination of several cases decided within the past eleven years." *Id.* at 120. The three Justices observed that "this Court has been unable to articulate a consistent, clear, and readily applicable majority expression of the automobile exception to the warrant requirement." *Id.* at 124.

Disagreement as to the parameters of the limitations on the automobile exception aside, until *Gary* a majority of this Court **never** suggested that Article I, Section 8 is compatible with the United States Supreme Court's Fourth Amendment holdings when analyzing warrantless automobile searches. In other words, what splintered the Court was just how "limited" our limited exception is and whether particular facts qualified as an exigency justifying the need to dispense with a magistrate's judgment. That cannot be mistaken for a suggestion that the foundation for those disputes--consistent majority expressions that Article I, Section 8 differs from the Fourth Amendment--was somehow open to debate. Nevertheless, the *Gary* plurality deemed it appropriate to apply *Edmunds*, and we now turn to its discussion of those factors.

*Edmunds* suggested to litigants urging adoption of greater protections under the Pennsylvania Constitution to discuss and develop at a minimum the following four factors: "1) text of the Pennsylvania constitutional provision; 2) history of the provision, including Pennsylvania case-law; 3) related case-law from other states; 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Edmunds*, 586 A.2d at 895. The *Gary* lead opinion addressed those factors. As to the first factor, the opinion concluded in short order that "there is nothing in the text of Article I, Section 8 to suggest that it confers greater protection than does the Fourth Amendment with regard to a warrantless search of a

motor vehicle." *Id.* at 125. For the second consideration, the plurality opinion concluded that while Article I, Section 8 can provide greater protections than its federal counterpart, in *Commonwealth v. Russo*, 934 A.2d 1199, 1205 (Pa. 2007), this Court stated that "the scope of protection afforded under Article I, Section 8" uses the same two-part test: a person must demonstrate "(1) a subjective expectation of privacy; and (2) that the expectation is one that society is prepared to recognize as reasonable and legitimate." 91 A.3d at 127 (quoting *Russo*, 934 A.3d at 1211). On this point, the *Gary* lead opinion agreed with the United States Supreme Court's observations regarding the reduced expectations of privacy in vehicles, particularly the fact that a vehicle's purpose is transportation and that they are extensively regulated. *Id.*

Turning to the third factor, most states have adopted the federal exception, and several states had formerly issued decisions granting more protections but over time modified those holdings "to conform to and/or remain consistent with U.S. Supreme Court jurisprudence in this area, jurisprudence which, as we have discussed above, has undergone its own modifications over time." *Id.* at 131. These Justices identified two states that have refused to adopt the bright-line federal automobile exception: Montana and Washington. Their opinion found those interpretations unpersuasive due to textual differences. Montana's rejection of the federal exception is "[b]ased on the Montana Constitution's unique and explicit privacy provision[.]" *Id.* Washington likewise "explicitly protects privacy" in its constitution. *Id.* "Given that the Pennsylvania Constitution has no provision analogous to Article I, Section 7 of the Washington Constitution, or to Article II, Section 10 of the Montana Constitution, we conclude that the experience of these states is unpersuasive." *Id.* at 132.

For the fourth factor, discussing the policies involved and unique issues of concern, the *Gary* authors found the benefits of a bright-line rule to be preferable to a case-by-case examination of whether exigent circumstances existed. A survey of cases "shows how the determination of exigency—or lack thereof— can turn on small facts in the midst of a complex, volatile, fast-moving, stressful, and potentially threatening situation in the field." *Id.* at 134. Other discrete facts, such as whether the officer could safely guard a vehicle or another person might move the vehicle, could matter a great deal. Additionally, individual jurists naturally weigh the exigencies of a given fact pattern differently depending on the facts, meaning that officers could not readily ascertain what types of situations would qualify as an exigency. Thus, a bright-line rule was preferable.

Justice Todd, joined by Justice Baer, dissented. Justice Todd observed that "Pennsylvania has long been at the constitutional forefront in recognizing the vital necessity of prior judicial approval of searches conducted by governmental officials, obtained through the warrant process, in order to maintain the fundamental right of the people to security from unreasonable searches and seizures." *Id.* at 139 (Todd, J., dissenting). Justice Todd agreed with the plurality that until the *White* decision, this Court "viewed the twin requirements of probable cause and exigent circumstances as mandated by both the Fourth Amendment to the United States Constitution and Article I, Section 8 of our own Constitution." *Id.* at 141. Unlike the plurality, the dissent interpreted *White* "to reflect a deliberate choice by our Court to chart an independent course in our jurisprudence under Article I, Section 8," as opposed to the federal approach. *Id.* Thus, while the plurality characterized their opinion as engaging in the *Edmunds* analysis in the first instance, Justice Todd believed that the failure in prior cases to explicitly discuss

those factors did not diminish their precedential effect. Cases subsequent to *White* "continu[ed] to insist on both probable cause and exigent circumstances as justification for a warrantless search of an automobile." *Id.* at 141. Accordingly, those precedents demonstrated that the Court made a deliberate choice **not** to follow federal law.

Justice Todd proceeded to review the four *Edmunds* factors. She "regard[ed] these factors to convincingly compel the rejection of a coterminous approach." *Id.* at 143. For the first factor, the dissent disagreed that nothing in the text suggests greater protection under Article I, Section 8. This constitutional provision "uses the term 'possessions,' which our Court has previously interpreted to mean intimate things about one's person, and also specifies that no warrant to search 'any place,' or to seize 'any ... things shall issue without ... probable cause.'" *Id.* (quotation marks and citations omitted). The absence of similar language in the Fourth Amendment suggests that Article I, Section 8 "was intended to protect an individual's privacy interest in **all** of his or her possessions or things in **any** place they may be," including a vehicle. *Id.*

Addressing the second factor, regarding the history of the text and how it has been applied, Justice Todd engaged in a scholarly review of the development of Article I, Section 8 and the Fourth Amendment to the United States Constitution. *Id.* at 143-48. "Based on this rich history, I regard our Constitution's warrant requirement to be one of singular and distinctive importance to Pennsylvania, in contrast to the later warrant requirement of the Fourth Amendment to the United States Constitution, which was based, in part, on this provision." *Id.* at 148. Article I, Section 8 recognizes "a robust individual right of privacy in one's papers and possessions, and protects that privacy right through its warrant requirements for searches of 'any place' such items may be found."

*Id.* The dissent further criticized the United States Supreme Court's reasons for departing from the initial rationales expressed in the earliest cases, noting that the Court "has never fully explained its rationale" in dispensing with a warrant requirement. *Id.* at 149.

Moving to the privacy interests involved, Justice Todd strenuously disagreed with the plurality's diminishment of privacy expectations regarding vehicles. Quoting scholarly criticism of the high Court's arguments on that point, Justice Todd concluded that the plurality's analysis "disregards the plain fact that today's automobile is not just used to transport persons, but, also, to store and transport a myriad of their most private belongings." *Id.* at 152. Nor is a car just a car; most Americans view their vehicle "as something more than just a means of transportation." *Id.* at 153.

As to the third factor, Justice Todd found the cases rejecting the federal exception to be more persuasive in light of the right to privacy imbedded in our charter as recognized in *Edmunds*. Finally, regarding the fourth factor's policy considerations, Pennsylvania has "purposefully sought to encourage the use of warrants to conduct searches by making them far easier for police officers to obtain in conducting field investigations." *Id.* at 157. Many of the precedents that found it impracticable for officers to obtain warrants could not account for later technological developments that have significantly eased that burden. In fact, warrants took considerably longer to obtain in the 1920s and yet the *Carroll* Court even then expressed a preference for warrants. "I consider police officers eminently capable as trained professionals of making the basic assessment of whether it is reasonably practicable for them to seek a warrant, under all of the circumstances existing at the time they wish to search an automobile." *Id.* at 159. According to the

dissent, the plurality failed to adequately consider whether technological developments made that task feasible.

All that analysis would settle nothing other than the case itself if not for a fourth vote. Now-Chief Justice Saylor filed a concurring opinion, agreeing to adopt a bright-line rule. *Id.* at 138 (Saylor, J., concurring). He did so despite the "inconsistency in the courts' rejection of bright-line rules restraining law enforcement as a means of protecting individual rights, while simultaneously embracing such rules when they facilitate law enforcement," and argued for "some clear and appropriate boundaries operating in both directions." *Id.* (footnote omitted).

> As reflected in the lead opinion, this Court has obviously had difficulty for quite some time in managing the appropriate contours of the automobile exception to the warrant requirement. Although I have some reservations, for the sake of certainty and consistency, I join the lead Justices in adopting the federal automobile exception.

*Id.*

Then-Justice Saylor did not join Justice McCaffery's opinion. As the remaining Justices split three-to-two on the underlying Article I, Section 8 dispute, there was no majority opinion expression on the parameters of the protections under our Constitution.

### III. Parties' Arguments

#### Alexander

Alexander criticizes the United States Supreme Court's development of the federal automobile exception as unmoored from its original rationale. The original formulation set forth in *Carroll* focused on "the need for quick action made necessary by reason of the inherent mobility of a car." Alexander's Brief at 9. He identifies five categories of cases in which the United States Supreme Court has approved warrantless vehicle

searches even though the need for quick action did not justify the searches: (1) where police have advance notice that a car will be carrying contraband; (2) where police have sufficient time to secure a warrant before searching parked vehicles; (3) where the suspect and vehicle are in police custody or otherwise secure; (4) searches of packages and containers within a vehicle on-site; and (5) searches of packages and containers that are removed from the vehicle and searched days later. Alexander argues that the result in *Gary* captures the warrantless searches in this array of situations despite the absence of any exigency.

Alexander further argues that these results are inconsistent with Article I, Section 8 under *Edmunds*. His brief proceeds to discuss each *Edmunds* factor, and his arguments largely track Justice Todd's dissenting opinion in *Gary*. Alexander adds that the plurality opinion "failed to acknowledge that this Court has consistently applied the warrant requirement in interpreting Article I, Section 8" in other contexts, and criticized the opinion for omitting detailed discussion of other areas where Pennsylvania affords greater protection. *Id.* at 15. *See, e.g.*, *Commonwealth v. Shaw,* 770 A.2d 295 (Pa. 2001) (departing from Fourth Amendment and holding that Article I, Section 8 requires warrant for release of blood alcohol test administered by hospital); *Commonwealth v. Melilli*, 555 A.2d 1254, 1257 (Pa. 1989) (recognizing a privacy interest in telephone numbers accessible by telephone company and holding that Article I, Section 8 requires warrant for installation of pen register device); *Commonwealth v. Grossman*, 555 A.2d 896, 899 (Pa. 1989) (declaring that warrant authorizing seizure of "all files" was unconstitutionally overbroad under Article I, Section 8; the requirement for describing items to be seized pursuant to a warrant under Article I, Section 8 is more stringent than the Fourth

Amendment). He argues that the *Gary* plurality erroneously asked whether enhanced privacy protections should be extended to vehicles instead of asking whether the warrant requirement of Article I, Section 8 should apply as a constitutional norm.

Alexander acknowledges that the majority of states apply the federal automobile exception, but he insists that this factor may not be analyzed merely by making a tally of the number of states adopting each position and accepting the resulting majority view. As Justice Todd's dissent developed, the courts adopting the federal exception "do not share our Commonwealth's robust historical commitment to the protection of the right of privacy, . . . thus being of little guidance for the purposes of *Edmunds*." *Gary*, 91 A.3d at 154 (Todd, J., dissenting).

For the fourth factor, Alexander adds a number of policy considerations in support of overruling *Gary*, with the primary consideration being the number of other exceptions to the warrant requirement often present in automobile cases that remain available, including voluntary consent, exigent circumstances that make it too difficult to obtain a warrant, and plain view.

Additionally, Alexander submits that Justice Todd more accurately captured the nature of the privacy interest in a vehicle. The dissent agreed with commentary arguing that most Americans have used their cars for storage at one time or another and that Americans view their vehicle as more than a means of transportation. Furthermore, the fact that cars are heavily regulated means only that the authorities have an interest in securing compliance with safety and traffic regulations and cannot support a wholesale loss of privacy in the entire vehicle. *Id.* at 150-51 (Todd, J, dissenting) (discussing 3 Wayne R. LaFave, Search & Seizure § 7.2(b) (5th ed. 2019)). Justice Todd found those

criticisms "to have substantial merit" and criticized the contrary view as "disregard[ing] the plain fact that today's automobile is not just used to transport persons, but, also, to store and transport a myriad of their most private belongings." *Id.* at 152. Vehicles contain a variety of features that let users store items away from public view such as trunks, glove boxes, and internal storage compartments. A vehicle is not just a method of transportation, as drivers frequently take long drives and many Americans opt for driving to work instead of taking public transportation precisely because of the privacy afforded by vehicles. As Justice Todd summarized the point, a vehicle functions as a "home away from home." *Id.* at 152.

Further, *Alexander* argues that technological advances decrease the timeframe for procuring a warrant. In *Missouri v. McNeely*, 569 U.S. 141 (2013), the Supreme Court rejected a bright-line rule permitting warrantless blood draws in DUI cases as a per se exigency, with the high Court recognizing "technological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency." *Id.* at 155. Alexander submits that the same logic should apply in the warrantless vehicular search context. *See also Commonwealth v. Romero*, 183 A.3d 364, 402 (Pa. 2018) ("It bears noting that *Steagald* [*v. United States*, 451 U.S. 204 (1981)] was decided in 1981; since then, the pervasiveness and efficiency of communication technology has grown exponentially."). Also, the law permits stops for the enforcement of vehicle code violations which are often a pretext for purposes other than a desire to enforce the traffic laws. The United States Supreme Court is "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual

officers," *Whren v. United States*, 517 U.S. 806, 813 (1996), and thus, "outside the context of inventory search or administrative inspection," ulterior motives cannot invalidate a vehicular stop. *Id.* at 812. Alexander cites statistical data recognized by other courts that minority drivers are disproportionately targeted by pretextual stops. Thus, requiring a detached magistrate to make the probable cause determination will generally safeguard privacy rights and specifically deter the disproportionate impact of warrantless searches on minority motorists. Addressing the issue of whether it is a greater or lesser intrusion to subject citizens to lengthy detentions while awaiting a search warrant, Alexander deems that a false dilemma. A citizen is free to put law enforcement to the test by requiring a warrant, and if the citizen wishes to give up that right they can simply consent.

Finally, Alexander criticizes the *Gary* plurality for failing to discuss stare decisis principles. For more than twenty years, this Court consistently indicated that Article I, Section 8 is part of our constitutional jurisprudence and *Gary* did not provide sufficient reasons to depart from those holdings.

<u>The Commonwealth</u>

The Commonwealth first argues that Alexander's issue has been waived pursuant to our recent decision in *Commonwealth v. Bishop*, 217 A.3d 833 (Pa. 2019), wherein this Court held that a defendant waived a claim that the Pennsylvania Constitution offers greater protection than the United States Constitution regarding the right against self-incrimination. In litigating a suppression motion, Bishop failed to argue that the protections provided by the constitutions differed, and this Court concluded that he waived his claim by failing to develop it before the trial court. The Commonwealth argues that the same result should obtain here because while Alexander referred to the Pennsylvania

Constitution in generic terms, the references "bore no meaningful connection to his current claims." Commonwealth's Brief at 10. His actual argument was limited to a lack of reasonable suspicion and/or probable cause "to detain, stop, frisk, search or question" Alexander. Thus, according to the Commonwealth, Alexander challenged only the stop and the lack of *Miranda* warnings, and not the application of *Gary*. The Commonwealth acknowledges that Alexander cited a case from this Court holding that luggage removed from a vehicle could not be searched without a warrant, but that case was based on the Fourth Amendment, and, in any event, the federal case cited therein as support was itself later overruled. The Commonwealth complains that the failure to apprise the government of the nature of his suppression claim prevented the Commonwealth from developing an evidentiary record to respond to the assertion that a search warrant could have easily been sought through remote technology.[8]

As to the merits, the Commonwealth first emphasizes stare decisis and stresses that this Court is not writing on a blank slate. Alexander's arguments that this Commonwealth should recognize greater protections under *Edmunds* were made by Justice Todd in *Gary* and the Court rejected them then. As a result, the *Gary* result should still control. "Stare decisis serves an important role by promoting the evenhanded,

---

[8] We find that Alexander sufficiently preserved the issue. The motion to suppress used a pre-printed check box form where he challenged, among other things, the failure to obtain a warrant before the search. At the evidentiary hearing, counsel stated that the motion was "based on the fact that the police lacked reasonable suspicion and probable cause to detain, stop, frisk, search or question my client in anyway. This motion is based on the United States Constitution, 4th, 5th and 14th Amendments **and the broader protections of Pennsylvania Constitution, Article One Section Eight**." N.T., 6/5/2017, at 3 (emphasis added). While the actual argument to the court did not touch on an argument that *Gary* should be overruled, counsel remarked at the end of the hearing, "This vehicle -- they could have gotten a search warrant." *Id.* at 22.

predictable, and consistent development of legal principles, fostering reliance on judicial decisions, and contributing to the actual and perceived integrity of the judicial process." Commonwealth's Brief at 15 (citation omitted). Acknowledging that stare decisis is not an absolute rule, the Commonwealth asserts that none of the traditional reasons to revisit precedent exist in this case. If anything, the Commonwealth believes that affirming *Gary* is particularly appropriate because a bright-line rule produces predictable and consistent outcomes. The decisions discussed in *Gary* illustrated that this Court failed to reach a consensus on the law in this area. While those disagreements were due to "sincere philosophical differences among members of this Court," *id*. at 17, the law was in flux and only a clear rule could promote stability. Furthermore, officers have since relied on the bright-line rule announced in *Gary* and overruling it would "tend to breed cynicism and create uncertainty as to whether this Court's decisions can be relied upon to provide lasting guidance." *Id*. at 18. The Commonwealth argues that Alexander has presented nothing in the six years since *Gary* that has changed, other than the membership of this Court. The Commonwealth claims that the rule of law is threatened by decisions that appear to be based only on personal views of its members and overruling *Gary* "would ultimately detract from efforts to establish a stable and enduring body of state constitutional law." *Id*. at 23.

The Commonwealth adds its belief that even under pre-*Gary* law, Alexander would not be entitled to relief because the probable cause to search arose unexpectedly due to a chance encounter; Alexander was not alone; the passenger owned the vehicle; and the incident occurred at 2:30 a.m. To this end, the Commonwealth adds that Justice Todd's

dissent criticized cases that were applying the federal rule in circumstances other than vehicular stops on a roadway. Commonwealth's Brief at 21, n.11.

In the event stare decisis is not sufficient reason to refuse Alexander's request, the Commonwealth disagrees with Alexander's view of the four *Edmunds* factors. Just as Alexander relies on Justice Todd's analysis of *Edmunds*, the Commonwealth points to the *Gary* plurality's analysis. The government argues that the first factor, constitutional text, does not weigh in Alexander's favor because he fails to explain how the term "possessions" meaningfully differs from "effects." More importantly, Alexander's argument that Article I, Section 8 provides greater protections on the basis of constitutional norms, i.e. a preference for a warrant, is unconvincing because the warrant preference does not answer the question of whether an exception should apply. Thus, nothing in the text of Article I, Section 8 suggests it is any different than the Fourth Amendment.

Turning to the second factor and the history of this Court's interpretation, the Commonwealth concedes that Article I, Section 8 is occasionally interpreted in a broader manner. But this Court has frequently rejected greater protection, too. *See, e.g.*, *Commonwealth v. Turpin*, 216 A.3d 1055, 1066-69 (Pa. 2019) (rejecting claim that separate warrant was necessary under Article I, Section 8 to search private bedroom of third party located within shared multi-bedroom residence); *Commonwealth v. Duncan*, 817 A.2d 455, 465 (Pa. 2003) (rejecting claim that Article I, Section 8 requires warrant to obtain name and address information associated with ATM card).

Third, the Commonwealth points out that post-*Gary* cases have confirmed that the majority of states apply federal law. The Iowa Supreme Court in *State v. Storm*, 898

N.W.2d 140 (Ia. 2017), surveyed the country and found five states, apart from Pennsylvania, that previously rejected the automobile exception but now follow it. Commonwealth's Brief at 29-30.

The final factor, policy justifications, should, according to the Commonwealth, balance in its favor because no matter what our Constitution demands, the federal exception would remain the law of the land. The Commonwealth believes that this would encourage forum shopping in that more prosecutions will occur in federal court where the federal rules would apply. The Commonwealth also emphasizes the high degree of factual pattern variance involving vehicular cases, which can involve, inter alia, various persons coming to the scene and potentially removing evidence; multiple passengers; and stops at times of the day when a magistrate may not be readily available. It also argues that the status of automobiles has not changed materially over the years since *Gary*, and people have less of an expectation of privacy in their vehicles versus other spaces like the home. And it points out that lengthy seizures will occur if police are required to obtain warrants in the absence of exigency, which is arguably a greater intrusion than simply searching the vehicle on scene.

The Commonwealth also disputes that search warrants are easily obtainable through technological means. Because Pennsylvania does not recognize the good faith exception to the exclusionary rule, the Commonwealth fears that errors in preparing warrants via remote technology will lead to unwarranted suppressions. Relying on the policy that warrant applications in Philadelphia must be approved by the district attorney's office before presentation to the issuing authority, the Commonwealth argues that the procedure poses a challenge in a case like this, where the stop occurred at 2:30 a.m.

## IV. Analysis

Turning to the core argument raised by Alexander that *Gary* is inconsistent with Article I, Section 8, we address first the Commonwealth's argument that *Gary* should not be revisited under stare decisis principles.

### 1.

Stare decisis is "a principle as old as the common law itself." *Morrison Informatics, Inc. v. Members 1st Fed. Credit Union*, 139 A.3d 1241, 1249 (Pa. 2016) (Wecht, J., concurring). The phrase "derives from the Latin maxim '*stare decisis et non quieta movere*,' which means to stand by the thing decided and not disturb the calm." *Ramos v. Louisiana*, ___ U.S. ___, 140 S. Ct. 1390, 1411 (2020) (Kavanaugh, J., concurring in part). "Without stare decisis, there would be no stability in our system of jurisprudence." *Flagiello v. Pennsylvania Hosp.*, 208 A.2d 193, 205 (Pa. 1965). It is therefore preferable "for the sake of certainty," *Commonwealth v. Tilghman,* 673 A.2d 898, 903 n.9 (Pa. 1996), to follow even questionable decisions because stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee,* 501 U.S. 808, 827 (1991) (citation omitted). As the United States Supreme Court recently stated, "To reverse a decision, we demand a special justification, over and above the belief that the precedent was wrongly decided." *Allen v. Cooper*, ___ U.S. ___, 2020 WL 1325815, at *6 (U.S. Mar. 23, 2020) (quotation marks and citation omitted). The Commonwealth believes that the only justification offered here for revisiting

*Gary* is a change in court composition and warns that overruling *Gary* threatens judicial integrity.[9]

Of course, as with virtually all legal rules, there are exceptions. No one would seriously maintain that stare decisis demands absolute fidelity to what came before. As Justice Kavanaugh remarked in *Ramos*, "Nobody on the Court believes in absolute stare decisis." *Ramos*, 140 S. Ct. at 1411 (2020) (Kavanaugh, J., concurring in part) (quoting Baude, Precedent and Discretion, 2020 S. Ct. Rev. 1, 4 (forthcoming)). In fact, precedent may be so questionable as to warrant overruling even when the parties have not raised the point. *Freed v. Geisinger Med. Ctr.*, 5 A.3d 212, 215 (Pa. 2010) ("We begin by noting there have been numerous occasions in which this Court has *sua sponte* reconsidered and overruled prior precedent.") (collecting cases). Ultimately, "whether it is appropriate for this Court to overrule prior precedent depends on a number of factors, all of which are implicated under the doctrine of stare decisis." *Id.* at 216.

The Commonwealth does not list these factors, but instead points to situations in which overruling precedent would be "manifestly appropriate, such as where prior decisions have proved unworkable, engendered widespread confusion, or been

---

[9] The Commonwealth's argument is both myopic and cynical. In 2007, a majority of this Court held to the view that Article I, Section 8 required probable cause and exigent circumstances to support a search of an automobile. *See Hernandez* and *McCree*. The composition of the Court changed between then and 2014 when *Gary* was decided. Following the Commonwealth's thinking, the abandonment of earlier Article I, Section 8 jurisprudence was solely a result of Justice McCaffery's addition to the Court and the departure of former Chief Justice Cappy, among others. Of course, the extensive analysis of the *Gary* lead opinion should not be denigrated by suggesting that it was solely a result of "a change in the composition of the Court." The attack by the Commonwealth in the context of this appeal is equally misplaced.

[J-51-2020] - 31

undermined by subsequent changes in society." Commonwealth's Brief at 16. In its view, none of those apply to *Gary*.

Our inquiry, however, is not so limited. The high Court has "identified several factors to consider in deciding whether to overrule a past decision, including 'the quality of [its] reasoning, the workability of the rule it established, its consistency with other related decisions, . . . and reliance on the decision*." Knick v. Twp. of Scott, Pennsylvania*, ___ U.S. ___, 139 S. Ct. 2162, 2177–78 (2019) (quoting *Janus* v. *State*, *County*, *and Municipal Employees*, 585 U.S. ——, 138 S.Ct. 2448, 2478 (2018)) (bracketing and ellipsis in original). The age of the challenged decision is also a relevant factor. "[T]he strength of the case for adhering to such decisions grows in proportion to their 'antiquity.'" *Gamble v. United States*, ___ U.S. ___, 139 S. Ct. 1960, 1969 (2019) (quoting *Montejo v. Louisiana*, 556 U.S. 778, 792 (2009)). Cases with a long lineage tend to have multiple precedents to overcome, *id.* ("Gamble's historical arguments must overcome *numerous* 'major decisions of this Court' spanning *170 years*,"), which is not an issue in *Gary*. In fact, as set forth at length supra, *Gary* itself had numerous precedents to overcome.

Additionally, *Gary* is a constitutional case, and stare decisis "is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions." *Agostini v. Felton*, 521 U.S. 203, 235 (1997) (citations omitted).

2.

We begin our analysis by observing again that *Gary* was not a majority decision but rather an opinion announcing the judgment of the court  *See* 210 Pa. Code § 63.4(B)(3) ("An opinion shall be designated as the 'Opinion Announcing the Judgment of

the Court' when it reflects only the mandate, and not the rationale, of a majority of Justices."). Now-Chief Justice Saylor's concurring opinion provided the crucial fourth vote that allowed *Gary* to constitute a binding holding as opposed to establishing only a case-specific result limited to Gary alone. The United States Supreme Court announced in *Marks v. United States,* 430 U.S. 188 (1977), that when it "decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." *Id.* at 193 (quotation marks and citation omitted). We apply the *Marks* rule. *See Commonwealth v. McClelland*, 233 A.3d 717, 731 (Pa. 2020) (applying *Marks*).

The rationale explaining *Gary*'s result from the perspective of three Justices was clear: Article I, Section 8 offers no greater protection than the Fourth Amendment in this area. Therefore, adopting the United States Supreme Court's case law posed no obstacle because the provisions were interpreted to be coterminous. Conversely, Justices Todd and Baer dissented from that conclusion. The rationale for the Chief Justice's opinion was not based on an analysis of Article I, Section 8. We reproduce the opinion in its entirety:

> As reflected in the lead opinion, this Court has obviously had difficulty for quite some time in managing the appropriate contours of the automobile exception to the warrant requirement. Although I have some reservations, for the sake of certainty and consistency, I join the lead Justices in adopting the federal automobile exception.
>
> I do wish to observe, however, that I find inconsistency in the courts' rejection of bright-line rules restraining law enforcement as a means of protecting individual rights,[1] while simultaneously embracing such rules when they facilitate law enforcement, *see* OAJC, at 124, 136–37. For my own part, I

> believe there would be benefit in maintaining some clear and appropriate boundaries operating in both directions. *Accord Perez,* 577 Pa. at 381–82, 845 A.2d at 792 (Saylor, J., concurring and dissenting) (concurring in the abandonment of one such bright-line rule protective of defendants' rights only because it had been consistently undermined by exceptions).

91 A.3d at 138–39 (Saylor, J., concurring).

Then-Justice Saylor's opinion therefore did not address the competing views of whether the federal automobile exception was compatible with Article I, Section 8. We believe that the concurring opinion, while certainly reflecting a carefully considered view based on this Court's difficulties in applying the exception does nothing more than establish the narrowest rationale for the result in *Gary*: the bright-line federal exception provides certainty and consistency in application.[10]

---

[10] Justices Dougherty and Mundy both object to this conclusion. Justice Mundy maintains that "then-Justice Saylor's concurrence espoused the prevailing viewpoint offered by the three other Justices." Dissenting Op. at 2 (Mundy, J., dissenting). Justice Dougherty agrees. Dissenting Op. at 3 n.1 (Dougherty, J.). Justice Dougherty observes that the Chief Justice must have fully joined the three-Justice opinion because to say otherwise represents a conclusion that the Chief Justice joined an opinion "even though he actually believed it violated our state charter[.]" *Id.* at 3 n.1. None of this overcomes *Gary*'s designation as an Opinion Announcing the Judgment of the Court and an examination of its votes, which readily dispels the notion that then-Justice Saylor somehow joined the three-Justice plurality's analysis of the Article I, Section 8 issue. *See Gary*, 91 A.3d at 138 ("Chief Justice CASTILLE and Justice EAKIN join the opinion.").

There is no doubt that four Justices in *Gary* shared the view that this Court should adopt the federal automobile exception. But there is also no doubt that the Court did not reach a majority consensus justifying that result. We reject the notion that the views of three Justices can be given stare decisis effect or that we should enshrine an interpretation of Article I, Section 8 that a majority of the Court, both now and before *Gary* was decided, has rejected and one which even Justice Dougherty cannot champion. *See* Dissenting Op. at 3 (Dougherty, J.). *See also* Concurring Op. at 2 (Baer, J.) ("In my view, it would indeed be ironic to conclude that stare decisis demands adherence to a decision that is premised upon a breach of that doctrine.")

Our learned colleagues apparently view the "Opinion Announcing the Judgment of the Court" designation as an administrative oversight, unnoticed by the Court and then-

The Commonwealth emphasizes the "certainty and consistency" that resulted from the concurring opinion, informing the Court at length that *Gary* produced a workable rule not only for the courts but the police, who "have systematically relied on *Gary* in determining when it is necessary to secure a warrant." Commonwealth's Brief at 18. The Commonwealth attributes the difficulty in applying something other than a bright-line rule to an "inability to anticipate the endless variety of circumstances in which probable cause to search an automobile may arise," which produced unpredictable applications of whether a given case qualified as a true exigency.

We disagree with the attempt to insulate *Gary* from review solely because it produced a workable outcome. The Commonwealth sounds the alarm that "overruling *Gary* would have a broad impact. It would impair the ability to enforce the law without any proportionate corresponding benefit." Commonwealth's Brief at 47-48 (footnote omitted). This presumes that we are free to ignore the Pennsylvania Constitution simply because it makes law enforcement more difficult, or, worse, that we are to determine the law based on what we think is good for law and order in society. We are not a policy branch, and we cannot ignore constitutional commands even if they make the work of police or prosecutors harder. *Cf. Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 325 (2009) ("The Confrontation Clause may make the prosecution of criminals more burdensome, but that is equally true of the right to trial by jury and the privilege against

Justice Saylor. If our fidelity to the votes and insistence that the phrase "Opinion Announcing the Judgment of the Court" does not mean the same thing as an "Opinion" constitutes a "hair-splitting analysis," Dissenting Op. at 2 (Mundy, J.), we embrace the criticism.

self-incrimination. The Confrontation Clause—like those other constitutional provisions—is binding, and we may not disregard it at our convenience.").

It is undeniable that *Gary* did not produce a majority holding on what our constitution means. "When considering whether to reexamine a prior erroneous holding, we must balance the importance of having constitutional questions *decided* against the importance of having them *decided right*." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 378 (2010) (Roberts, C.J., concurring). The Commonwealth asks us to enshrine a precedent that simply did not decide the Article I, Section 8 question at all. To modify Chief Justice Roberts' observation, there is surely an importance of having constitutional questions **actually** decided. The Commonwealth maintains that respect for the law will be threatened if *Gary* is overruled, but we think that the graver danger is permitting three Justices' views of Article I, Section 8 to be given the same precedential weight as a clear majority simply because the opinion gained a fourth vote that did not address the constitutional issue raised by Alexander in this case. *Gary* came last but that is no reason to give it the last word. "[S]tare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable." *Helvering v. Hallock*, 309 U.S. 106, 119 (1940).

*Gary* is questionable precisely because it did not decide the Article I, Section 8 question. The role of this Court is to interpret the Constitution and to say what it means. *Gary* did not do so. The fact that it made things less difficult for law enforcement is irrelevant. In *Arizona v. Gant*, 556 U.S. 332 (2009), the United States Supreme Court examined the State's argument that *Belton v. New York*, 453 U.S. 454 (1981), announced a bright-line rule regarding a police officer's authority to search the interior of a vehicle as

a search incident to arrest, per the search incident to arrest rationale set forth in *Chimel v. California*, 395 U.S. 752 (1969).[11] Those searches were authorized generally on the grounds that an arrestee might gain access to the vehicle and destroy evidence or obtain a weapon. The argument that *Belton* established a bright-line rule rested on the notion that such a rule was needed to protect officer safety and provide a workable rule. Of course, as with this Court's experience with the limited automobile exception, the justifications animating that rule could not plausibly be said to apply to many situations in which courts interpreted *Belton* to authorize the search. *Gant* was such a case; the arrestee was handcuffed and locked in the patrol car. The *Gant* Court rejected application of *Belton*, stating: "To read *Belton* as authorizing a vehicle search incident to every recent occupant's arrest would thus untether the rule from the justifications underlying the *Chimel* exception." 556 U.S. at 343. Addressing stare decisis concerns and the need for a workable rule, the Court responded:

> Although it appears that the State's reading of *Belton* has been widely taught in police academies and that law enforcement officers have relied on the rule in conducting vehicle searches during the past 28 years, many of these searches were not justified by the reasons underlying the *Chimel* exception. Countless individuals guilty of nothing more serious than a traffic violation have had their constitutional right to the security of their private effects violated as a result. The fact that the law enforcement community may view the State's version of the *Belton* rule as an entitlement does not establish the sort of reliance interest that could outweigh the countervailing interest that all individuals share in having their constitutional rights fully protected. **If it is clear that a practice is unlawful, individuals' interest in its discontinuance clearly outweighs any law enforcement 'entitlement' to its persistence.**

---

[11] This Court in *White* rejected *Belton* as inconsistent with Article I, Section 8.

*Id.* at 349 (emphasis added, footnotes omitted). *Gary* did not produce a majority as to whether the practice of warrantless searches based on probable cause alone is unlawful, and the Commonwealth is clearly not entitled to the persistence of an illegal practice. Thus, this Court is obligated to answer the question that *Gary* left open.

3.

The foregoing would constitute a sufficient reason to revisit *Gary*, but there are additional justifications. *Gary* itself served to effectively overturn decades of cases decided by majorities which held that Article I, Section 8 does in fact differ from federal law. True, the cases could not agree on how those differences applied. The plurality Justices clearly believed that the post-1995 departures from federal law starting with *White* rested on unsupported and inadequate foundations. But it bears mentioning again as demonstrated in the prior discussion of our pre-*Gary* jurisprudence that this was hardly a novel criticism. The charge that departures from federal law were not justified was leveled from inception. Notwithstanding, those precedents themselves became part of our body of law over the ensuing decades and generated their own reliance interests, and neither the Commonwealth nor the *Gary* plurality explain why those decisions, even if wrongly decided, did not warrant the deference that the Commonwealth now demands of *Gary*.

And while the Commonwealth is correct that the *Gary* plurality could have accepted Justice Todd's cogent analysis of the *Edmunds* factors, the decisions criticized by *Gary* likewise presented many opportunities to consider all the criticisms lodged by the *Gary* plurality. The Courts issuing the precedents that *Gary* limited were obviously aware of the argument that the Article I, Section 8 analysis was not adequately supported given

that concurring or dissenting opinions in those same cases raised that very point. *See White*, 669 A.2d at 903-04 (Montemuro, J., concurring) ("In the instant case, the Majority has failed to employ the *Edmunds* analysis in deciding that Article I, Section 8 of the Pennsylvania Constitution provides more protections than the Fourth Amendment of the United States Constitution . . . ."); *id.* at 910 (Castille, J., dissenting) ("I agree with Mr. Justice Montemuro that in providing Pennsylvania citizens broader protections under the Pennsylvania Constitution than are provided under analogous provisions of the federal constitution, as the majority purports to do, the four-prong test set forth by this Court in [*Edmunds*] should be applied."); *Luv*, 735 A.2d at 95 (Castille, J. concurring) ("I would further note my belief that the majority continues to construe too narrowly the automobile exception to the warrant requirements. In my dissent in *White*, I proposed the adoption of a bright line rule . . . .").

Thus, *White* and its progeny created its own reliance interests. Until *Gary* was issued, a majority of this Court never suggested that Article I, Section 8 is compatible with the United States Supreme Court's bright-line rule for determining the lawfulness of a warrantless automobile search. Nor has *Gary* become entrenched or adopted by later majorities of this Court. Only five decisions from this Court have cited *Gary*, three of which involved citing *Gary* for propositions of law other than the one at issue here. *Commonwealth v. Livingstone*, 174 A.3d 609, 618 (Pa. 2017) (quoting *Gary*'s recitation of the standard of review of claims regarding denial of a suppression motion); *Commonwealth v. Arter*, 151 A.3d 149, 153 (Pa. 2016) (same); *Commonwealth v. Jacoby*, 170 A.3d 1065, 1081 (Pa. 2017) (citing *Gary* for general discussion of when search warrants may issue). The remaining two cases likewise did not demonstrate any

additional affirmation of *Gary*. In *Commonwealth v. Valdivia*, 195 A.3d 855 (Pa. 2018), we noted that the Commonwealth did not suggest that the police officers had probable cause to suspect the vehicle contained drugs and stated "there is no cause for discussion of the automobile exception to the warrant requirement as an alternative basis to support the search." *Id.* at 865 n.11 (citing *Gary* for its adoption of the federal automobile exception). Lastly, in *Commonwealth v. Loughnane*, 173 A.3d 733, 735 n. 1 (Pa. 2017), a case decided on other grounds, we reviewed the Superior Court's application of *Gary* and the federal exception. In so doing, we questioned the precedential value of *Gary*. *Id.* at 735 n.1 ("The lead opinion in *Gary* was designated as an 'Opinion Announcing the Judgment of the Court' . . . because while a majority of the Court supported the adoption of the federal automobile exception, only a plurality joined in the rationale behind it.").

In other words, the idea that *White* and its progeny failed to adequately address Article I, Section 8 was not a new theory that became clear only with the benefit of time and further development of the law, which is, among others, a reason to overturn precedent. *United States v. Gaudin*, 515 U.S. 506, 521 (1995) ("And we think stare decisis cannot possibly be controlling when, in addition to [other] factors, the decision in question has been proved manifestly erroneous, and its underpinnings eroded, by subsequent decisions of this Court."). The *Gary* plurality's analysis did not identify any manifest error or erosion of the challenged precedents. All the *Gary* plurality established was a fervent belief that the criticisms of *White* should have carried the day.

4.

Taking into account all of the foregoing factors—the recency of *Gary*, the lack of a controlling rationale that enjoyed majority support, the absence of reliance interests, and

the importance of having constitutional questions decided—stare decisis does not demand adhering to the views of three Justices on the critical question of what the Pennsylvania Constitution means. Nor does it require giving conclusive effect to the fourth vote, which decided only that the time had come to follow the federal model due to perceived difficulties in deciding the contours of Article I, Section 8 as applied to automobile searches.

The *Gary* result is impossible to uphold if Article I, Section 8 and its unshakable link to privacy requires greater protections when an automobile search is at issue. The federal bright-line rule must be consistent with Pennsylvania norms and standards and must account for our constitutional text and precedents interpreting it. It does not serve to simply point to the federal model, which weighs, as we shall explain, the cost and benefits of police action versus citizens' rights differently.

## V. *Edmunds* and Article I, Section 8

Normally, the party asking to overturn a precedent will invariably win if the case is overruled. *Gary*, as explained at length supra, did not actually decide the impact of Article I, Section 8 on automobile searches. Overruling the result in *Gary* simply means that this Court will decide what the Pennsylvania Constitution requires in this domain.[12]

---

[12] Justice Dougherty's Dissenting Opinion argues that we do not offer any "meaningful weighing of the traditional factors this Court should consider when making the difficult decision whether to cast aside one of our precedents." Dissenting Op. at 5 (Dougherty, J.). If the preceding pages do not qualify as meaningful, then any response to our learned colleague will surely be deemed equally unsatisfactory. Nevertheless, we observe that Justice Dougherty appears to find our analysis wanting largely because we do not accept the fiction that now-Chief Justice Saylor's critical fourth vote, concurring in the result in *Gary*, was really no different than a full joinder. *See* supra n.10. Had this Court definitively settled whether Article I, Section 8 is compatible with the federal automobile exception, Justice Dougherty's Dissent aptly explains why that hypothetical decision, even if we

We conclude that Justice Todd's *Edmunds* analysis thoroughly and convincingly established the heightened protocols of Article I, Section 8 and see no need to tread that same ground. The scholarly analysis thoroughly discussed the four *Edmunds* factors, and we adopt Justice Todd's compelling analysis as our own. We briefly address some additional points.

First, we are highly persuaded by Justice Todd's analysis of the relevant textual provision. The three-Justice opinion in *Gary* concluded without elaboration that "Article I, Section 8 . . . is very similar to the text of the Fourth Amendment." *Gary*, 91 A.3d at 124 (citations omitted). The opinion then observed that "there is nothing in the text of Article I, Section 8 to suggest that it confers greater protection than does the Fourth Amendment with regard to a warrantless search of a motor vehicle." *Id.*

The lead opinion in *Gary* on this point paints too broadly because it does not recognize that possessory and privacy interests can be different with respect to the vehicle itself versus items within that vehicle. *See e.g.* 3 Wayne R. LaFave, Search & Seizure § 7.2(a) (5th ed. 2019) ("[T]wo privacy interests are present in a *Chambers*-type situation: (i) the possessory interest in maintaining control over the vehicle; and (ii) the secrecy interest with respect to the contents of the car."). The *Gary* three-Justice opinion overlooked that point by declaring that the Fourth Amendment and Article I, Section 8 are textually similar. Justice Todd aptly explained why that is incorrect.

> The plurality finds "nothing in the text of Article I, Section 8 to suggest that it confers greater protection than does the Fourth Amendment with regard to a warrantless search of a motor

believed it to be wrong, should remain on the books. Relatedly, while Justice Dougherty notes that in this case, Chief Justice Saylor opposes overruling *Gary*, Dissenting Op. at 3 (Dougherty, J.), we note that the Chief Justice does not take umbrage with our stare decisis analysis.

vehicle." I respectfully disagree. Unlike the Fourth Amendment, Article I, Section 8 uses the term "possessions," which our Court has previously interpreted to mean "intimate things about one's person," *Commonwealth v. Russo*, 594 Pa. 119, 934 A.2d 1199, 1214–15 (2007), and also specifies that no warrant to search "any place," or to seize "any ... things shall issue without ... probable cause." Pa. Const. art. I, § 8 (emphasis added). Inasmuch as these expansive terms are absent from the Fourth Amendment, this difference in language suggests that the warrant requirement of Article I, Section 8 was intended to protect an individual's privacy interest in all of his or her possessions or things in any place they may be, which would include, by necessity, when they are located inside of an automobile. I would, therefore, conclude that these textual differences support an interpretation of Article I, Section 8 broader than its federal counterpart in regard to the expectation of privacy owners and occupants of automobiles enjoy with respect to their personal possessions transported therein.

*Id.* at 143 (internal citation omitted).

We also add that *Edmunds* itself, in rejecting the "good faith" exception to the exclusionary rule, calibrated the interests of society in securing criminal convictions and law enforcement needs versus privacy protections quite differently than does the United States Supreme Court. The basis for that different balancing, i.e. Article I, Section 8's link to privacy protections as advanced by the warrant requirement, cannot be ignored in this context inasmuch as weighing the same interests tends to dominate debates surrounding the wisdom of following the federal automobile exceptions. Addressing the then-forthcoming decision in *United States v. Ross*, 456 U.S. 798 (1982), a commentator observed:

> The decision in *Ross* will be shaped by the struggle between two philosophies which have heretofore mustered almost equal support within the Court. One view proposes that exceptions to the warrant clause be narrowly drawn to emphasize the judicial preference for a warrant. The opposing

> rationale supports broadening the exceptions to the warrant
> clause to promote effective law enforcement.

3 Wayne R. LaFave, Search & Seizure § 7.2(d) (5th ed. 2019) (quoting Katz, Automobile Searches and Diminished Expectations in the Warrant Clause, 19 Am.Crim.L.Rev. 557, 601–02 (1982)).

That neatly encapsulates the debate between the Commonwealth and Alexander. Likewise, promoting effective law enforcement is the driving force explaining the United States Supreme Court's applications of the exclusionary rule. "[T]he deterrent effect of suppression must be substantial and outweigh any harm to the justice system . . . the criminal should not 'go free because the constable has blundered.' " *Herring*, 555 U.S. at 147-48 (quotation marks and citation omitted). In *Edmunds*, we "consider[ed] the appropriateness of a 'good faith' exception to the exclusionary rule in the Pennsylvania constitutional scheme." *Edmunds*, 586 A.2d at 896. *Edmunds* rejected that exception as inconsistent with Article I, Section 8, stating that **"**[t]he history of Article I, Section 8 . . . indicates that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the 4th Amendment, as articulated by the majority in *Leon."* *Id.* at 897. "[B]eginning in 1973 . . . this Court began to forge its own path under Article I, Section 8 of the Pennsylvania Constitution, declaring with increasing frequency that Article I, Section 8 of the Pennsylvania Constitution embodied a strong notion of privacy, notwithstanding federal cases to the contrary." *Id.* at 898. Deterrence is not the focus in determining remedies for violations of Article I, Section 8. "Citizens in this Commonwealth possess such rights, even where a police officer in 'good faith' carrying out his or her duties inadvertently invades the privacy or circumvents the strictures of probable cause." *Id.* at 899.

The *Gary* lead opinion, as well as the minority criticisms of *White* and its progeny over the years, were premised on concerns for effective law enforcement and the specter of unwarranted suppressions stemming from reasonable police conduct employed in sometimes tense and unpredictable situations. Justice Castille's concurrence in *Luv* urged adoption of a bright-line rule "to prevent police officers from having to make a choice whether, on the one hand, to take the time to obtain a warrant and thereby risk flight of the automobile or, on the other hand, not to obtain a warrant and risk suppression of the evidence[.]" *Luv*, 735 A.2d at 95. His *Perry* concurrence argued that the exception as set forth in *White* "is unjustifiably hostile to perfectly reasonable police conduct." *Perry*, 798 A.2d at 708 (Castille, J., concurring). The *Gary* lead opinion likewise asserted that the bright-line rule was needed to ensure uniformity, in large part because "the determination of exigency—or lack thereof—can turn on small facts in the midst of a complex, volatile, fast-moving, stressful, and potentially threatening situation in the field." *Gary*, 91 A.3d at 134.

We think that *Edmunds* itself mandates that we cannot reflexively cede our citizens' constitutional rights to privacy to the needs of law enforcement and the concern that evidence may be suppressed. Contrary to the view that suppressing evidence represents an implicit hostility to police conduct, this Court in *Edmunds* viewed the matter quite differently:

> We have no reason to believe that police officers or district justices in the Commonwealth of Pennsylvania do not engage in "good faith" in carrying out their duties. What is significant, however, is that our Constitution has historically been interpreted to incorporate a strong right of privacy, and an equally strong adherence to the requirement of probable cause under Article 1, Section 8. Citizens in this Commonwealth possess such rights, even where a police

officer in "good faith" carrying out his or her duties inadvertently invades the privacy or circumvents the strictures of probable cause. To adopt a "good faith" exception to the exclusionary rule, we believe, would virtually emasculate those clear safeguards which have been carefully developed under the Pennsylvania Constitution over the past 200 years.

*Edmunds*, 586 A.2d at 899.

Similarly, a finding in a case that an officer's warrantless search was not justified by an exigency does not reflect hostility to his or her actions. It means only that our constitution places greater emphasis on the violations of privacy occasioned by an unreasonable search. The question of whether the federal automobile exception "virtually emasculate[s] those clear safeguards" was not addressed by *Gary*. If the United States Constitution tips the scale towards law enforcement needs in analyzing Fourth Amendment questions, our own charter does not when addressing Article I, Section 8. *See White*, 669 A.2d at 902 ("[T]his court has increasingly emphasized the privacy interests inherent in Article I, Section 8 of the Pennsylvania Constitution. By contrast, the United States Supreme Court has deemphasized the privacy interests inherent in the Fourth Amendment.") (citation omitted). The *Gary* approach is antithetical to Article I, Section 8 because it permits warrantless searches even in scenarios where it is beyond question that police officers could have sought a warrant before the vehicle is searched. Article I, Section 8 requires that we ask whether the violation of privacy interests inherent in allowing widespread warrantless searches is compatible with the Pennsylvania Constitution. We think it is not. Due to the rich history of our charter protecting privacy as established in *Edmunds* and explained by Justice Todd in *Gary*, our constitution prioritizes the protection of privacy rights caused by the unreasonable search above the need to present incriminating evidence in court and to assist law enforcement efforts.

Additionally, the *Gary* plurality was troubled by inconsistent applications and thought that the bright-line rule was warranted to encourage uniformity. Respectfully, we think that its case for inconsistent applications is overstated, with the plurality succumbing to a selection bias on two distinct levels. First, suppression cases only arise when incriminating evidence is found. By definition, courts will rarely encounter the countless number of cases in which an officer unjustifiably concludes that probable case was present, but the search turns up nothing. To the extent that overruling *Gary* will encourage police officers to obtain a warrant whenever practicable, that outcome adheres to what we said in *Edmunds* regarding the preference for a warrant.

Second, the host of citations to cases from this Court grappling with discrete applications of our automobile exception jurisprudence is somewhat misleading. Absent a death penalty case, every automobile exception case decided by this Court will involve our exercise of discretionary review. It would be surprising if the cases we selected for review did **not** involve difficult applications. There is little reason to think that the bulk of the cases involving automobile searches decided by the trial court or Superior Court involved the same degree of difficulty. And, of course, we retain the option to grant discretionary review and offer continued guidance to the bench and bar consistent with what Article I, Section 8 demands.

Finally, overruling *Gary* corrects the anomaly that the protections of Article I, Section 8 of our constitution and the privacy interests it envelops evaporate when a citizen enters her automobile.

## VI. Response to the Chief Justice's Dissent

In dissent, Chief Justice Saylor disagrees with our *Edmunds* analysis by focusing on the textual similarities between Article I, Section 8 and the Fourth Amendment. The Dissent applies an originalist approach, arguing that the similarities reflect no difference regarding "the protections intended by the respective framers[.]" Dissenting Op. at 2. Respectfully, the Dissent's comparison of the relevant textual provisions gives short shrift to this Court's pronouncement that Article I, Section 8 "is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries." *Edmunds*, 586 A.2d at 897.

*Gary*, like the Dissent, broadly acknowledged this aspect of our jurisprudence but diminished its significance by citing "this Court's adoption of the federal Fourth Amendment test to determine the scope of protection afforded under Article I, Section 8[.]" *Gary*, 91 A.3d at 127 (quoting *Commonwealth v. Russo,* 934 A.2d 1199, 1211 (Pa. 2007) (citations omitted)). That test requires a person to demonstrate "(1) a subjective expectation of privacy; and (2) that the expectation is one that society is prepared to recognize as reasonable and legitimate." *Id.*

But there is no inconsistency in applying the foregoing test as a guiding principle while incorporating Pennsylvania-specific considerations regarding enhanced privacy interests. *See White*, 669 A.2d at 902 ("[T]his court has increasingly emphasized the privacy interests inherent in Article I, Section 8 of the Pennsylvania Constitution. By contrast, the United States Supreme Court has deemphasized the privacy interests inherent in the Fourth Amendment.") (citation omitted). As one example of an enhanced privacy right, in *Commonwealth v. DeJohn*, 403 A.2d 1283 (Pa. 1979), we held that a

depositor has standing to challenge the seizure of his or her bank records, rejecting the United States Supreme Court's decision in *United States v. Miller*, 425 U.S. 435 (1976). We elected to follow a California decision interpreting the California Constitution, which specifically includes a right to privacy. The Commonwealth argued that the California decision should not be followed "since the Pennsylvania Constitution contains no explicit provision pertaining to the right to privacy[.]" *Id.* at 1291. We disagreed, noting that Article I, Section 8 "is tied into the implicit right to privacy in this Commonwealth." *Id.* (citing *Griswold v. Connecticut*, 381 U.S. 479 (1965) and *In re B*, 394 A.2d 419, 425 (Pa. 1978)). Thus, the principles applied by the United States Supreme Court to define the expectations that society is prepared to recognize as reasonable under the Fourth Amendment are not the same as the ones we apply to determine what our constitution would recognize as reasonable and legitimate.

*Commonwealth v. Shaw*, 770 A.2d 295, 296 (Pa. 2001), further demonstrates the point that, contrary to the *Gary* plurality's assertions, the scope of protection under Article I, Section 8 is distinct for reasons that extend beyond the text of Article I, Section 8. In *Shaw*, we held that Article I, Section 8 protects the results of a blood alcohol test performed by a hospital for medical purposes where the Fourth Amendment does not. This conclusion was based on privacy considerations. Significantly, we did not rely solely on the text of Article I, Section 8 in reaching that conclusion. We looked to precedents applying Article I, Section 1, which states: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, § 1. To establish that "[t]he right

to privacy extends to medical records of patients," 770 A.2d at 299, we cited *In re June 1979 Allegheny Cty. Investigating Grand Jury*, 415 A.2d 73 (Pa. 1980), and *Denoncourt v. Com., State Ethics Comm'n*, 470 A.2d 945 (Pa. 1983). The *In re June 1979* Court stated, "Clearly, the privacy interest of the patients which is implicated under the instant set of facts is the interest in avoiding disclosure of personal matters. This privacy interest finds explicit protection in the Pennsylvania Constitution, Art. 1, § 1[.]" 415 A.2d at 77. And the citation to *Denoncourt* was to the portion of the opinion wherein a plurality stated, "This Court has recognized the existence of a constitutionally guaranteed right of privacy based on Article 1, § 1 of the Pennsylvania Constitution. . . ." *Denoncourt*, 470 A.2d at 947–48 (Flaherty, J., joined by McDermott and Zappala, JJ.).[13] Thus, our cases hold that the privacy expectations involved in addressing an Article I, Section 8 claim extend beyond textual similarities (or dissimilarities, as the case may be). We must consider our charter as a whole in terms of establishing a set of normative values that limits the government's authority to search without a warrant, as opposed to the Dissent's view, which attempts to divine the framers' intent based solely on a textual comparison of Article I, Section 8 and the Fourth Amendment.

That Article I, Section 8 must be read in conjunction with more abstract considerations of how far the government may encroach on the rights of citizens is not a new theory. In *Pap's A.M. v. City of Erie*, 812 A.2d 591, 603 (Pa. 2002), wherein we

---

[13] These citations did not escape the notice of the dissenting Justices. Justice Castille, joined by then-Justice Saylor, filed a dissenting opinion criticizing the *Shaw* majority for relying on cases that did not interpret Article I, Section 8. *See Shaw*, 770 A.2d at 305-06 (Castille, J., dissenting) (noting that the majority cited a plurality portion of *Denoncourt* that "lacks precedential value," while *In re June 1979* "never so much as cited Article I, § 8.").

declined to follow the high Court's interpretation of the First Amendment in interpreting our analogous Article I, Section 7 provision, we cited Article I, Section 1 as forming a component of our *Edmunds* analysis. We observed that "[t]he very first Article of the Pennsylvania Constitution consists of the Pennsylvania Declaration of Rights, and the first section of that Article affirms, among other things, that all citizens have certain inherent and indefeasible rights." *Id.* at 603 (quotation marks omitted). We stated that the specific rights under Article I are "[a]mong those inherent rights[.]" *Id.*

*City of Erie* is not directly on point because there the question was whether our charter would recognize a right that the federal constitution does not; here, there is no dispute that an automobile is protected. Yet that case, like *Shaw*, confirms that the degree of protection enjoyed by a Pennsylvania citizen rests on something more than the mere text of Article I, Section 8. As Justice Todd catalogued in her *Gary* dissent, "the federal approach discounts the vital individual privacy interests historically protected in this Commonwealth by Article I, Section 8." *Gary*, 91 A.3d at 140 (Todd, J., dissenting).

In sum, the Dissent's textual analysis of Article I, Section 8 versus the Fourth Amendment does not acknowledge any broader privacy interests protected by our constitution. The criticism goes beyond the dispute about whether *Gary* is reconcilable with *Edmunds* and Pennsylvania-specific constitutional holdings. It calls for overruling *Edmunds* itself and expresses a desire to give "greater significance . . . to the absence of any textual delineation of an exclusionary precept in the Pennsylvania Constitution, as well as this Court's non-recognition of a state-level exclusionary rule throughout 200 years of its history." Dissenting Op. at 2-3 (Saylor, C.J.). However, both parties accepted the continuing vitality of *Edmunds*, and the briefing in this matter has addressed whether *Gary*

is compatible with our Article I, Section 8 jurisprudence. That analysis includes, of course, *Edmunds.*

By criticizing the foundations upon which our holding is built, the Dissent does not address that a "steady line of case-law has evolved under the Pennsylvania Constitution, making clear that Article I, Section 8 is unshakably linked to a right of privacy in this Commonwealth." *Edmunds*, 586 A.2d at 898. It would hold that the unshakable links forged by our cases should never have been formed. But fortunately, the links have been established. We must follow the chain and acknowledge the greater privacy protections established by the Pennsylvania Constitution and our precedents.

## VII. Conclusion and Mandate

As a result of today's decision, we return to the pre-*Gary* application of our limited automobile exception under Article I, Section 8 of our Constitution, pursuant to which warrantless vehicle searches require both probable cause and exigent circumstances; "one without the other is insufficient." *Luv*, 735 A.2d at 93. "This dual requirement of probable cause and exigency is an established part of our state constitutional jurisprudence." *Hernandez*, 935 A.2d at 1280. As to the renewed application of this principle, we share the confidence expressed by Justice Todd in her dissenting opinion in *Gary,* specifically that police officers are "eminently capable as trained professionals of making the basic assessment of whether it is reasonably practicable for them to seek a warrant, under all of the circumstances existing at the time they wish to search an automobile." *Gary*, 91 A.3d at 159 (Todd, J., dissenting).

We are mindful, however, that in some future cases we may have to say that a police officer's warrantless search was not justified by exigent circumstances. Difficulties

in clarifying the scope of the exigency requirement will lead to debates about what exactly the Pennsylvania Constitution demands in a given situation. But so what? The long history of Article I, Section 8 and its heightened privacy protections do not permit us to carry forward a bright-line rule that gives short shrift to citizens' privacy rights. In *Ramos v. Louisiana*, ___ U.S. ___, 140 S. Ct. 1390, 1411 (2020), the high Court overruled cases holding that the United States Constitution does not demand unanimous verdicts for felonies. Responding to concerns that stare decisis counseled against overruling, the Court responded:

> In the end, the best anyone can seem to muster against Mr. Ramos is that, if we dared to admit in his case what we all know to be true about the Sixth Amendment, we might have to say the same in some others. But where is the justice in that? Every judge must learn to live with the fact he or she will make some mistakes; it comes with the territory. But it is something else entirely to perpetuate something we all know to be wrong only because we fear the consequences of being right.

*Id.* at 1408.

We cannot offer a definition of exigency that will apply to all scenarios. No case law suggest that the exigency requirement in other scenarios is subject to precise definition. The basic formulation of exigencies recognizes that in some circumstances "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (internal quotation marks omitted). That inquiry is not amenable to per se rules and requires a consideration of the totality of the circumstances. *See, e.g.*, *Commonwealth v. Davido*, 106 A.3d 611, 623 (Pa. 2014) ("We do not suggest that domestic abuse cases create a per se exigent need for warrantless

entry; rather, a reviewing court must assess the totality of the circumstances presented to the officer before the entry in order to determine if exigent circumstances relieved the officer of the duty to secure a warrant.").

Obtaining a warrant is the default rule. If an officer proceeds to conduct a warrantless search, a reviewing court will be required to determine whether exigent circumstances existed to justify the officer's judgment that obtaining a warrant was **not** reasonably practicable. That the universe of qualifying "exigent circumstances" is impossible to define with precision does not justify adopting the federal automobile exception any more than the inability to supply an objective definition of whether an expectation of privacy is "reasonable" justifies jettisoning the Fourth Amendment. *See Oliver v. United States*, 466 U.S. 170 (1984) ("No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant."). Courts will have to decide, just as they did pre-*Gary*, whether exigent circumstances justified warrantless searches in discrete scenarios, with a focus on the particular facts.

The remaining question is whether the instant search was authorized under that standard, and the answer requires further development. The Commonwealth claims that the litigation herein "prevented the Commonwealth from placing evidence on the record that advanced communications technology is not used for search warrants by the local judiciary in Philadelphia – a matter relevant to defendant's claim on appeal that the automobile exception is supposedly no longer necessary." Commonwealth's Brief at 12 n.5. Additionally, the testimony was not particularly directed at the exigencies of the

situation.  We therefore reverse the order of the Superior Court, with directions to remand the matter to the trial court for further proceedings consistent with this opinion.

Order reversed.  Jurisdiction relinquished.

Justices Baer, Todd and Wecht join the opinion.

Justice Baer files a concurring opinion.

Chief Justice Saylor and Justices Dougherty and Mundy file dissenting opinions.